**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

|  |  |
|---|---|
| KERI A. WEESE, | CASE NO. 1:22-CV-2215 |
| Plaintiff, |  |
| vs. | MAGISTRATE JUDGE AMANDA M. KNAPP |
| COMMISSIONER OF SOCIAL SECURITY, | **MEMORANDUM OPINION AND ORDER** |
| Defendant. |  |

Plaintiff Keri A. Weese ("Plaintiff" or "Ms. Weese") seeks judicial review of the final

decision of Defendant Commissioner of Social Security ("Commissioner") denying her

application for Disability Insurance Benefits ("DIB") and Supplemental Security Income

("SSI").  (ECF Doc. 1.)  This Court has jurisdiction pursuant to 42 U.S.C. § 405(g).  This matter

is before the undersigned pursuant to the consent of the parties under 28 U.S.C. § 636(c) and

Federal Rule of Civil Procedure 73.  (ECF Doc. 7.)  For the reasons set forth below, the Court

**AFFIRMS** the Commissioner's decision.

## I.    Procedural History

Ms. Weese filed applications for DIB and SSI on March 9, 2017, alleging a disability

onset date of January 3, 2017. (Tr. 265, 278, 397-98.)[1]  She alleged disability due to seizures,

migraines, past head injury, PTSD, fatigue, neuropathy and pain in left leg.  (Tr. 421.)  Her

application was denied at the initial level (Tr. 290-91) and on reconsideration (Tr. 316-17), and

---

[1] Ms. Weese's initial SSI application was not located in the file, but the administrative determinations on her March
2017 application address both DIB and SSI benefits.  (*See, e.g.,* Tr. 290-91.)

she requested a hearing (Tr. 350-51).  A hearing was held before an Administrative Law Judge ("ALJ") on October 5, 2018.  (Tr. 211-63.)  The ALJ issued an unfavorable decision on December 27, 2018 ("2018 ALJ Decision").  (Tr. 190-209.)  Ms. Weese's request for review of the decision by the Appeals Council ("AC") was denied on February 28, 2020, making the ALJ's decision the final decision of the Commissioner.  (Tr. 1-4.)

Ms. Weese appealed the 2018 ALJ Decision to the U.S. District Court, which reversed and remanded the decision on July 6, 2021.  (Tr. 1247, 1275-1305.)  In support of remand, the District Court found: "the ALJ either overlooked or misconstrued evidence relating to [Ms. Weese]'s [2] subjective allegations of extreme fatigue and, without a more thorough analysis, the Court is unable to determine whether the ALJ's assessment of [Ms. Weese]'s subjective allegations regarding her fatigue and/or the decision finding [Ms. Weese] not disabled are supported by substantial evidence."  (Tr. 1275.)

While the 2018 ALJ Decision was awaiting District Court review, Ms. Weese filed new applications for DIB and SSI on April 28, 2020 (Tr. 1150, 1272) which were denied at the initial level (Tr. 1231-32) and on reconsideration (Tr. 1248-49).  On January 13, 2022, following the District Court remand, the AC vacated the 2018 ALJ Decision, remanded the case for further proceedings consistent with the July 6, 2021 District Court decision, and consolidated the 2017 and 2020 DIB and SSI claims for consideration as a consolidated case on remand.  (Tr. 1272.)

A telephonic hearing was conducted before an ALJ on May 6, 2022.  (Tr. 1160-97.)  The ALJ issued an unfavorable opinion on August 24, 2022 (Tr. 1126-59), and Ms. Weese appealed directly to the district court, filing the instant appeal (ECF Doc. 1).  The matter is fully briefed and ripe for review.  (ECF Docs. 8, 11, 12.)

---

[2] Plaintiff was formerly known as Keri A. Teodecki.  (*See Teodecki v. Comm'r of Soc. Sec.*, No. 1:20-CV-00867, 2021 WL 2806200 (N.D. Ohio July 6, 2021).

## II.     Evidence

### A.     Personal, Educational, and Vocational Evidence

Ms. Weese was born in 1982 and was 34 years old on the alleged disability date, making her a younger individual under Social Security regulations.  (Tr. 1148.)  She had at least a high school education.  (*Id*.)  Ms. Weese had not worked since 2017. (Tr. 1171.)

### B.     Medical Evidence

#### 1.     Relevant Treatment History

##### i.     Physical Impairments

On May 4, 2016, Ms. Weese was seen at Summa Health System Emergency Department after falling out of her bed and hitting her wrist on the nightstand.  (Tr. 477.)   X-rays were taken with no abnormal findings.  (Tr. 482.)  She was discharged with a diagnosis of contusion on her right wrist.  (Tr. 481, 482-484.)

On November 10, 2016, Ms. Weese saw Heather Miller, CNP, at Summa Physicians, Inc., with complaints of left knee pain with a tender bump below her right knee.[3]  (Tr. 508, 571.) Ms. Weese reported left knee pain for over a year and a tender bump below her knee for three or four days.  (*Id*.)  A physical examination revealed: tenderness in the left leg below the knee with swelling; painful range of motion in the left knee; and normal mood and affect.  (Tr. 509, 572.) CNP Miller referred Ms. Weese for a duplex venous left upper extremity ultrasound, a left knee x-ray, and orthopedic treatment of her right knee.  (*Id*.)  The ultrasound was normal.  (Tr. 509.)

 From 2015 through 2017, Ms. Weese treated with neurologist Roswell Dorsett, D.O., at the White Pond Neurology Office of the Western Reserve Health System for post traumatic

---

[3] The records have conflicting notes regarding which knee was injured. (*See* Tr. 508, 571, 572.)

seizure disorder and migraine without intractability.  (Tr. 666-678, 706-715.) [4]  She complained of: seizures, headaches, migraines, vertigo, dizzy spells, fatigue, sleep apnea, and a swollen left lower extremity with left leg pain.  (*See* Tr. 667, 669, 670, 672, 674, 676, 706, 709, 711, 713, 715.)  Physical examination findings were consistently normal.  (Tr. 667, 671, 674, 706-707, 709, 711, 713.)  Her seizures were noted to be well controlled with medication.  (Tr. 667, 669, 671, 672-673, 711, 713.)  Once, Dr. Dorsett noted that a fever could cause a seizure and advised that Ms. Weese should not work if she had a fever.  (Tr. 674, 711.)  On January 18, 2017, Dr. Dorsett ordered a CT scan for Ms. Weese's seizure disorder.  (Tr. 676.)  On March 9, 2017, Ms. Weese reported snoring loudly at night, excessive daytime sleepiness, and daily vertigo; Dr. Dorsett ordered testing to assess for sleep apnea and peripheral vestibulopathy.  (Tr. 706.)

Ms. Weese had a head CT scan on January 24, 2017, and vestibular testing on March 30, 2017.  (Tr. 663, 716-719.)  The CT scan showed "mild parenchymal volume loss."  (Tr. 663-664.)  The clinical impression from vestibular testing was "central vestibular disease . . . secondary to her vertical upbeating nystagmus" which was noted throughout the testing, "constant when fixation [was] removed."  (Tr. 716.)  "[T]here [were] no signs of nystagmus consistent with peripheral vestibular disease."  (*Id*.)  Recommendations included further assessment to rule out "central vestibular disease and brainstem disease" and "vestibular rehab protocols as part of [a] physical therapy program."  (*Id*.)

On April 3, 2017, Ms. Weese saw Morgan Jones, M.D., at the Sports Health Center—Cleveland Clinic regarding her left knee pain.  (Tr. 726.)  Ms. Weese reported knee problems for 10 months, after a fall in June 2016.  (*Id*.)  Physical examination of the left knee showed:

---

[4] The dates on the medical records are blurry, making it difficult to discern exact dates.  The exhibit notes indicate that the records date from 1/12/15 to 3/1/17 (Tr. 666-678) and 1/28/16 to 3/31/17 (Tr. 706-715), which appears consistent with the documents.  As the date ranges suggest, several of the documents appear to be duplicates.

decreased flexion on active and passive range of motion; tenderness in the medial joint line; trace swelling/effusion; positive McMurray's; and normal stability, muscle strength, sensation, and reflexes. (Tr. 727-28.) Examination findings for the right knee were normal. (*Id.*) Dr. Jones assessed a left knee medial meniscus tear and ordered a left knee MRI. (Tr. 728.)

The MRI was performed on April 13, 2017, and read by Carl Winalski, M.D., whose impression was: "SMALL KNEE JOINT EFFUSION. MODERATE EFFUSION OF THE PROXIMAL TIBIOFIBULAR JOINT. NO MR SIGNS OF MENISCAL TEAR." (Tr. 731-32, 737.) Ms. Weese followed up with Dr. Jones on the same date, reporting continued muscular pain in the distal thigh and knee. (Tr. 721, 735.) Physical examination of the left knee showed: decreased flexion on active and passive range of motion; tenderness in the lateral joint line and patellofemoral; no swelling/effusion; and normal stability, muscle strength, and sensation. (Tr. *Id.*) Physical examination of the right knee was normal. (Tr. 721.) Dr. Jones noted that the MRI showed abnormal lateral and patellofemoral mild chondral defect, but no meniscal pathology. (Tr. 721.) Dr. Jones diagnosed left knee mild osteoarthritis, referred Ms. Weese to physical therapy, and directed her to follow up in two months. (Tr. 721-22.)

On June 22, 2017, Ms. Weese presented for an initial evaluation with neurologist, Betsy Garratt, D.O., at University Hospitals, regarding her migraines and epilepsy. (Tr. 807-811.) She reported a traumatic brain injury in 1992, when she was nine years old, following an automobile accident. (Tr. 807.) She had received therapy and was able to return to school after six months. (*Id.*) She ultimately graduated from high school with her class but started having seizures after high school. (*Id.*) She had treated at the Cleveland Clinic for epilepsy and seizures, taking Dilantin and Lamictal. (*Id.*) She reported worsening migraines, dizziness, and numbness in her left leg starting in October 2016, but denied seizures. (Tr. 807-808, 811.) She complained of

daily episodes of extreme fatigue, where she would lie down on the couch and sleep through the day, and said she snored loudly at night but there was "no apnea."  (Tr. 808.)   She also reported that her headaches were preceded by dizziness, followed by constant stabbing pain in the front of her head that worked itself around her head; but she was able to tolerate the light and did not suffer associated nausea or vomiting.  (*Id*.)  Neurological examination findings were unremarkable, except noted rotatory nystagmus.  (Tr. 810.)  Dr. Garratt indicated her examination was "significant for bilateral diffuse nystagmus and dizziness with extra ocular movements."  (Tr. 811.)  She diagnosed common migraine without aura, epilepsy, and nystagmus, and ordered lab testing and a brain MRI.  (Tr. 810-11.)  Dr. Garratt also requested a Dilantin level check, indicating that symptoms may be related to Dilantin toxicity.  (Tr. 811.)

A brain MRI was performed on July 6, 2017, and read by Charles Frederick Lanzieri. (Tr. 780-81.)  The impression was: "[i]ncreased signal in the frontal white matter" that "may be physiologic"; and no evidence of hemorrhage, mass lesion or acute infarction.  (Tr. 781.)

Ms. Weese returned to Dr. Garratt on July 20, 2017.  (Tr. 800-803.)  She reported her that her dizziness improved after she reduced Dilantin "on her own accord," and that she felt much better on a lower dose despite regular headaches; she was interested in getting off Dilantin completely.  (Tr. 800, 803.)  Her examination findings were largely unremarkable and her bidirectional rotatory nystagmus appeared slightly improved.  (Tr. 802.)  Dr. Garratt observed that the MRI showed "areas of white matter changes bifrontal, likely consistent with her prior history of [traumatic brain injury] TBI," and "was negative for any cause."  (Tr. 802, 803.)  Dr. Garratt agreed to transition Ms. Weese from Dilantin to Topamax, and was hopeful Topamax would work for both epilepsy and migraine so Ms. Weese could stop verapamil.  (Tr. 803.)

On September 6, 2017, Ms. Weese went to the emergency room at ACH Lake Medina, complaining of bruising in her right arm, tingling in her arms and legs, and shortness of breath; she reported being "Dilantin toxic" three months before, and recently tapering up her Topamax. (Tr. 892-893.)  Her EKG was normal.  (Tr. 895.)  Earl J. Myers, M.D., noted: "patient had a brief episode of shortness of breath.  She smokes almost 2 pack of cigarettes daily [and] has a history of reactive airway disease. Her lungs are currently clear, chest x-ray is normal."  (Tr. 896-97.) The final impression included: adverse reaction of antiepileptic, initial encounter; dyspnea and respiratory abnormalities.  (Tr. 897.)  Ms. Weese was stable for discharge that day.  (*Id*.)

Ms. Weese followed up with Dr. Garratt regarding her migraines and epilepsy on September 21, 2017, reporting that her migraine frequency had not improved with the Topamax. (Tr. 796-99.)  She had stopped taking Dilantin and verapamil.  (Tr. 796.)  She denied any seizures and her dizziness and eye movement had improved.  (*Id*.)  However, she complained of blurry vision since increasing her Topamax dose.  (*Id*.)  Dr. Garratt diagnosed common migraine without aura, nystagmus, and epilepsy, and recommended an ophthalmology evaluation.  (Tr. 798.)  Dr. Garratt noted great improvement in the nystagmus, but that Ms. Weese was reporting less response as to headache frequency and dizziness with the change in medication. (Tr. 799.) Ms. Weese was not interested in trying different medications for her migraines but would consider a referral for Botox with Dr. Reed.  (*Id*.)  Dr. Garratt indicated that they would await the ophthalmology appointment and then consider further evaluation.  (*Id*.)

On February 26, 2018, Ms. Weese saw Deborah Reed, M.D., at University Hospitals, for evaluation of her migraine headaches.  (Tr. 821-826.)  Ms. Weese said she did not feel Topomax affected her headaches, but it helped with seizures and there were no side effects.  (Tr. 821.)  She also reported taking "[L]amictal [for] 20 years for seizures," which also did not affect headaches.

(Tr. 822.)  Her last seizure was six to seven years prior, and was a "partial complex seizure." (*Id*.)  Ms. Weese reported the following regarding treatment history: over-the-counter pain relievers were unsuccessful for her migraines; Percocet and Oxycontin knocked her out and were not effective; Vicoprofen helped with her migraines but they would come back; marijuana was effective with one "hit" and it lasted three to four hours; she had not tried Toradol, Medrol, nerve blocks or Botox injections.  (*Id*.)  Ms. Weese reported 16-20 migraines per month and said that she slept a lot during the day, usually because of migraine pain.  (*Id*.)  She noted that she had not had children because of being on Dilantin and having seizures, but said she wanted to have children.  (*Id*.)  Her examination revealed abnormal findings at cranial nerves V, VII, and VIII, and an abnormal coordination, gait, and sensory examination.  (Tr. 824.)  Her motor examination was noted to be abnormal, but her muscle bulk, strength, and tone were normal in upper and lower extremities; Dr. Reed noted: "L leg 'weak' not to testing."  (*Id*.)  Dr. Reed diagnosed "Chronic migraine without aura, with intractable migraine, so stated, with status migrainosus," prescribed Toradol and Sumatriptan, increased tizanidine, and recommended Botox injections in four weeks.  (Tr. 825-26.)  He noted: "Question REM sleep disorder off of [D]ilantin consider [N]eurontin during 'bad weeks.'"  (Tr. 826)

Ms. Weese followed up with Dr. Garratt on March 12, 2018.  (Tr. 936-39.)  She reported that she was still taking naps and that marijuana was the only thing that helped with headaches. (Tr. 936.)  She was still having daily headaches and chronic dizziness, and was scheduling Botox injections for the next month.  (*Id*.)  She and her boyfriend reported considering having children.  (*Id.*)  Ms. Weese's general and neurological examination findings were largely unremarkable and her nystagmus appeared to be almost resolved.  (Tr. 939.)  Dr. Garratt explained that Ms. Weese would need to stop taking Topamax if she was considering having

8

children.  (*Id.*)  They planned to taper Ms. Weese off Topamax and keep her on another medication that was a preferred medication for epilepsy during pregnancy.  (*Id.*)

Ms. Weese returned to Dr. Garratt on June 15, 2018.  (Tr. 1119-23.)  She reported that she did not have the Botox injections and had been in the hospital for abdominal pain.  (Tr. 1119.)  She reported that a prior sleep study found she did not have sleep apnea, but said she continued to snore at night and felt daytime somnolence.  (*Id.*)  Her GI doctor thought GERD might be causing her snoring, and recommended that she start on medication for acid reflux.  (*Id.*)  Ms. Weese also reported that she had a headache a few days prior that lasted three days.  (*Id.*)  Her general and neurological examination findings were unremarkable, with a normal gait and her nystagmus almost resolved.  (Tr. 1122.)  Ms. Wees reported that she was off Dilantin, had increased Topamax, and was taking lamotrigine.  (*Id.*)  Dr. Garratt recommended tapering off Topamax because Ms. Weese was considering having children, but explained that headaches might increase as she stopped the Topamax.  (*Id.*)  Dr. Garratt increased Lamictal and recommended that Ms. Weese follow up with Dr. Reed regarding the Botox injections.  (*Id.*)

Ms. Weese attended a sleep study at Cleveland Clinic on September 18, 2018.  (Tr. 159-61.)  Based on those results, reviewed and interpreted by Carlos L. Rodriguez, M.D., Ms. Weese was diagnosed with obstructive sleep apnea.  (Tr. 160-61.)

She attended a follow up with her neurologist Dr. Garratt on September 28, 2018 (Tr. 1113-17), reporting that she was completely off Topamax and was "on Lamictal monotherapy" (Tr. 1113).  She described sleeping from 8:30 p.m. to 6:30 a.m., then getting the kids ready for school by 8:30 a.m., by which time she was dizzy and her head was hurting and she would fall asleep for the rest of the day.  (*Id.*)  Even though she was only awake for about six hours daily, she was sometimes falling asleep at the dinner table.  (*Id.*)  She felt completely wiped out from

doing chores at home and was too tired to walk the dog.  (*Id*.)  General and neurological and examination findings remained unremarkable.  (Tr. 1116.)  As to the reported headaches, Dr. Garratt recommended that Ms. Weese follow up with Dr. Reed; she was not interested in going back on Topamax and insurance did not approve Botox injections, but Dr. Garratt thought "[m]aybe a CGRP receptor antagonist could be considered."  (*Id*.)  As to the reported daytime sleepiness, Dr. Garratt recommended that Ms. Weese be evaluated by a sleep specialist, noting she had already been set up for a sleep study; they also discussed that sleepiness could be related to depression, and Dr. Garratt recommended further treatment for depression, and recommended that Ms. Weese's primary care physician look for other medical causes like thyroid abnormality. (Tr. 1116.)  As to seizures, Dr. Garratt ordered an EEG and labs and instructed Ms. Weese to immediately report any seizure activity.  (*Id*.)  Dr. Garratt also suggested weight loss, a sugar elimination diet, and a regular exercise program.  (Tr. 1116-17.)

On December 18, 2018, Ms. Weese attended a follow up appointment with Dr. Desai regarding her sleep study.  (Tr. 1678-80.)  She reported daytime naps and snoring, and said she was drinking energy drinks and expresso to stay awake.  (Tr. 1678.)  Dr. Desai diagnosed sleep apnea and wrote "[w]ill send autopap supplies," but advised that Ms. Weese obtain input from sleep medicine in light of her history of seizure disorder and migraines.  (Tr. 1680.)

Ms. Weese established care with Douglas Moul, MD, at the Cleveland Clinic Sleep Disorders Center on February 5, 2019.  (Tr. 1672-77.)  She was using an autopap but struggling to keep the mask on at night; she no longer flailed around in her sleep but continued to suffer daytime sleepiness.  (Tr. 1673.)  Dr. Moul diagnosed obstructive sleep apnea, mild overall, severe in REM, and recommended workup in the SAM clinic.  (Tr. 1677.)  Ms. Weese followed up with Brittany McLaughlin, CNP, at the SAM Clinic on February 27, 2019.  (Tr. 1665-67.)

10

CNP McLaughlin instructed Ms. Weese to continue use of her Auto CPAP with Flonase for congestion and a CPAP max pillow and Gas X for light aerophagia.  (Tr. 1667.)  By May 2019, CNP McLaughlin observed that Ms. Weese was doing well on PAP therapy.  (Tr. 1652.)

On July 13, 2019, Ms. Weese attended a primary care appointment with Dr. Desai to discuss the use of Wellbutrin for smoking cessation; she was smoking a pack and a half daily. (Tr. 1648.)  She reported using her CPAP regularly, saying she "d[id] not know how she lived without it," and felt a "complete difference when she wakes up in the morning. Refreshed sleep. If she does nap, she naps with CPAP on. Nap maybe one hour.  Migraines have improved—was able to get off of Topamax." (*Id.*)  Dr. Desai prescribed a nicotine patch; Ms. Weese was not a candidate for Wellbutrin due to her history of epilepsy.  (Tr. 1650.)

At a follow up visit with Dr. Garrett at the Epilepsy Center on October 16, 2019 (Tr. 1645-48), Ms. Weese reported that she was seizure free, and her seizures were well controlled on Lamictal (Tr. 1645.)  Her main complaints were daytime sleepiness and migraines, for which she was to be seen the following day.  (*Id.*)  Neurological examination findings were generally unremarkable.  (Tr. 1647.)  Dr. Garratt indicated that the cause of the daytime sleepiness "could be multifactorial (residual from osas, aeds, tbi)," and recommended a discussion of treating "EDS" (Ehlers-Danlos syndrome) "which could include wake promoting agents."  (*Id.*)

On January 21, 2020, Ms. Weese attended an orthopedic appointment with Bradley Pierce, M.D., complaining of left hip pain that had been bothering her for almost a year; she had been doing physical therapy for three months without relief and was on her second round of prednisone.  (Tr. 1630-32.)  Dr. Pierce reviewed lumbar and hip x-ray findings, and advised that Ms. Weese's "history and exam are a bit more consistent with her radiographic findings of lumbar osteoarthritis and radiculopathy," while her hip exam and x-rays of hips were "not

11

impressive for any major issues." (Tr. 1630.)  The lumbar x-ray showed "No acute fracture or traumatic subluxation; maintained disc height; and some disc space narrowing at L1-L2 and L5-S1, with mild endplate spurring at L5-S1." (Tr. 1632.)  Dr. Pierce recommended that Ms. Weese sustain anti-inflammatory use and attempt some chiropractic work.  (Tr. 1630.)  If she continued to have trouble, he would refer her to the spine institute for a potential cortisone injection.  (*Id.*)

Ms. Weese presented to Stephanie Ziegman, APRN, at the CCF Strongsville Spine Institute on February 3, 2020 (Tr. 1621-26), complaining of bilateral low back pain into her buttocks and legs (Tr. 1621).  She had tried physical therapy for three months from November 2019-January 2020, along with NSAIDs (*e.g.*, Meloxicam), with no improvement.  (*Id.*)  Her physical examination findings were unremarkable, with normal gait, strength, and range of motion, but with decreased sensation on the entire right side of the body.  (Tr. 1624-25.)  APRN Ziegman diagnosed low back pain with bilateral sciatica and lumbosacral neuritis and ordered a lumbar MRI.  (Tr. 1625.)  She suspected a herniated disc with L5 nerve impingement.  (*Id.*)

Her February 18, 2020 lumbar MRI revealed multilevel lumbar spondylosis, most pronounced at L4-5, with mild spinal canal stenosis, moderate bilateral foraminal stenosis, and incidentally noted assimilation joint of L5 in the left sacral ala.  (Tr. 1736-41.)  At L3-L4, the MRI noted bilateral facet arthropathy and a mild posterior disc bulge resulting in mild bilateral foraminal stenosis.  (Tr. 1737.)  At L4-L5, the MRI noted a central disc protrusion with annular fissure resulting in mild narrowing of the spinal canal and bilateral subarticular recesses and bilateral facet arthropathy resulting in moderate bilateral foraminal stenosis.  (Tr. 1737-38.)

Ms. Weese returned to the Spine Center to discuss her MRI with APRN Ziegman on February 21, 2020.  (Tr. 1616-20.)  She was feeling worse and the distribution of her symptoms was unchanged.  (Tr. 1616.)  On examination, she demonstrated a decreased lumbar range of

12

motion but normal gait, no spasm or tenderness, and normal reflexes and strength.  (Tr. 1619). Straight leg raise was negative and sensation was intact.  (*Id.*)  APRN Ziegman diagnosed lumbosacral neuritis and ordered an L4-L5 intralaminar epidural steroid injection.  (*Id.*)

Ms. Weese received a lumbar epidural steroid injection ("LESI") on March 6, 2020.  (Tr. 1604-1606.)  On March 17, 2020, she reported to Dr. Desai in a telephone encounter that she had an injection and was feeling much better within one week of the injection; her energy level had "skyrocketed," she had "zero pain," she could perform chores, and she felt "great."  (Tr. 1600.) In a May 27, 2020 telephonic pain management encounter with Dawn Boyle, CNP (Tr. 1583-84), Ms. Weese reported that her symptoms improved by 85-90% after her March 2020 LESI, but said she had begun experiencing intermittent shooting pain down her left leg (Tr. 1584).  She was scheduled for a repeat LESI (*id.*), which was performed on June 16, 2020 (Tr. 1573-1576).

At a follow up with CNP Boyle on July 20, 2020 (Tr. 1917-20), Mr. Weese reported minimal (0%) improvement following her June 2020 LESI, with worsening pain at an intensity of 8/10 (Tr. 1917).  Her examination reflected positive facet loading and tenderness to palpation, but was otherwise unremarkable.  (Tr. 1918-19.)  CNP Boyle scheduled a bilateral L4-5, L5-S1 lumbar facet medial branch nerve block (Tr. 1919) which was performed on July 30, 2020 (Tr. 1911-1915).  On August 17, 2020, she reported 75-80% overall improvement and requested a repeat injection.  (Tr. 1969.)  She underwent another lumbar facet medial branch nerve block on September 1, 2020.  (Tr. 1962-1966.)  After reporting that her pain improved greater than 60% with the diagnostic facet medial branch nerve blocks, and that her activity level increased, she underwent radiofrequency ablation ("RFA") of the medial branch nerves at L4, L5, and S1 levels on the left on October 23, 2020 (Tr. 2038-2041) and on the right on November 6, 2020 (Tr. 2032-2035).

In May 2020, Ms. Weese attended virtual appointments with family sports medicine doctor Laura M. Distel, M.D., at CCF-North Olmsted, reporting right wrist pain after her new puppy pulled the leash.  (Tr. 1591-92, 1586-87.)  X-rays and grip strength were normal, and she was advised to wear a brace.  (Tr. 1587.)  She attended a follow up with Nicholas Rabah and Dr. Distel in June, complaining of continued pain traveling to her shoulder.  (Tr. 1580-81.)  Dr. Distel noted soft tissue swelling, pain with supination/pronation, and tenderness, and ordered an MRI.  (Tr. 1581.)  The June 22, 2020 MRI revealed partial thickness tearing of the scapholunate ligament.  (Tr. 1723-26.)  No further follow up treatment records were identified by the parties.

Ms. Weese established care with podiatrist Gina Hild, D.P.M., at the Orthopedic and Rheumatologic Institute at Medina Hospital in July 2020, complaining of a painful bunion on her right foot.  (Tr. 1921-24.)  Dr. Hild diagnosed tinea pedis of both feet and hallux malleus of the right foot.  (Tr. 1923-24.)  X-rays revealed a hallux malleus deformity on the right foot's interphalangeal joint.  (Tr. 1923, 1933-36.)  Dr. Hild dispensed bunion shields and shoe gear modifications, cultured the skin and wound, and prescribed medications.  (Tr. 1924.)  She also briefly discussed surgical options to correct the big toe abnormality.  (*Id.*)  At a September 2, 2020 follow-up (Tr. 1959-62), Ms. Weese reported the conservative measures were not successful and wanted to undergo foot surgery to correct the toe (Tr. 1959, 1962). She underwent a right interphalangeal joint fusion of her right great toe on November 13, 2020.  (Tr. 2020-27.)

Ms. Weese attended a podiatry follow-up with Dr. Hild on January 5, 2021.  (Tr. 2015-16.)  She was using a surgical shoe at home, her pain level had improved to 4/10, and she asked about shoes; she also reported that she was getting ready for a beach vacation and wanted to get a pedicure.  (Tr. 2015.)  She had started smoking again.  (*Id.*)  Dr. Hild gave the okay for a stiff soled shoe and counseled smoking cessation.  (Tr. 2016.)  At a follow-up in March (Tr. 2005-

14

06), she told Dr. Hild that she "[w]asn't having any pain until today when she bumped [her toe]" (Tr. 2005.)  An x-ray revealed that the interphalangeal joint was not fused and there was some lucency around the screw/hardware.  (Tr. 2006.)  Dr. Hild diagnosed nonunion after arthrodesis and ordered a bone stimulator and scheduled a procedure to remove the screw.  (*Id.*)  Ms. Weese underwent a hardware removal of the right great toe with application of a bone stimulator on April 2, 2021.  (Tr. 1996-2000.)  At a six-week follow up, Dr. Hild noted that Ms. Weese was using a bone stimulator with good success and no change in the toe position.  (Tr. 2152.)  She was in full weightbearing status with a surgical shoe with "very intermittent" pain that rose to a level 5/10.  (*Id.*)  Mild erythema and edema remained at the surgical site, but the surgical wound was healing.  (*Id.*)  Imaging showed surgical changes but preserved joint spaces.  (Tr. 2163.)

On January 8, 2021, Ms. Weese presented to Dr. Shin at Medina Pain Management Center for an appointment regarding her back pain.  (Tr. 2705-08.)  She reported persistent pain in the left lumbar region that did not radiate and had improved overall with injections; she said her pain was more evident when she walked barefoot, and was improved when she wore her "prescription/running shoes."  (Tr. 2705.)  Her physical examination was unremarkable, except that she was positive for left paraspinal tenderness at the L2-L4 levels.  (Tr. 2707-08.)  Dr. Shin observed that her low back pain secondary to facet arthropathy had improved after the RFA procedure, and that her current pain was more myofascial/muscle spasm pain.  (Tr. 2708.)  He recommended "a conservative course mainly as a form of exercise and strengthening of the back" and did not refill any medications; Ms. Weese was to follow up as needed.  (*Id.*)

Ms. Weese attended an assessment with Troy Naftzeger PA-C, at Advanced Spine Joint and Wellness on September 15, 2021 (Tr. 2611-13), complaining of low back pain that had been worsening for two years (Tr. 2611).  She reported difficulty with homemaking, lifting, personal

care, sitting, sleeping, standing, and walking if done for more than 20 minutes.  (*Id*.)  On examination, PA Naftzger observed "obvious discomfort," "severely antalgic gait," severely restricted range of motion, decreased strength in lower extremities, and a "markedly positive" straight leg raise.  (Tr. 2612.)  PA Naftzger diagnosed radiculopathy, sciatica, disc degeneration, tdisc displacement, piriformis syndrome, and enthesopathy, and recommended a lumbar MRI. (Tr. 2613.)  The next day, PA Naftzger reviewed the MRI results with Ms. Weese, saying the films revealed mild to moderate disc degeneration at L4 to L5 with mild to moderate disc bulging and sacralization of L5 to S1.  (Tr. 2616.)  He recommended PT, chiropractic care, SI joint injection, and pain management.  (Tr. 2616-19.)  Ms. Weese received lumbar trigger point injections that day from John Milvurn II, CNP.  (Tr. 2614-15.)

On October 5, 2021, Ms. Weese attended an initial examination with Tagreed M. Khalaf, MD, at the Cleveland Clinic Spine Institute, complaining of low back pain.  (Tr. 2470-76.)  She was last seen in pain management by Dr. Shin in January 2021.  (Tr. 2470.)  She reported having a spine injection at Advanced Spine and Joint in Medina three weeks before with no relief.  (*Id.*) Her physical examination revealed full strength but limited lumbar extension with pain on facet loading on the left, deferred lumbar flexion due to pain anticipation, pain at the left L4, L5, S1 paraspinals, diminished sensation to light touch at left L4, L5, S1, inability to perform tandem gait due to anticipation, and inability to perform some of the examination because she was unable to lie supine.  (Tr. 2475.)  Dr. Khalaf ordered a lumbar CT and instructed Ms. Weese to follow up after her CT scan; he made notes to consider a pseudo joint injection for Bertolottis at left L5-S1 and consider a consult with the center for pain recovery.  (*Id.*)  There are no noted follow up records with Dr. Khalaf, but Ms. Weese did receive further treatment from Advanced

Spine Joint and Wellness in September, October, and November 2021, including PT and chiropractic manipulative treatments.  (Tr. 2622-2703.)

### ii.    Mental Impairments

On May 16, 2016, Ms. Weese had an adult diagnostic assessment completed at Solutions Behavioral Healthcare, Inc. ("Solutions"). (Tr. 492-502.)  She reported suffering a traumatic brain injury from a car accident in 1992 or 1993, but did not recall much about it.  (Tr. 495, 497, 501.)  Ms. Weese discussed relationship problems with her abusive significant other.  (Tr. 492, 497.)  She was diagnosed with intermittent explosive disorder and recommended for individual counseling.  (Tr. 501.)   On May 19 and 26, 2016, Ms. Weese attended individual counseling sessions.  (Tr. 503-504, 694-695.)  During her May 26, 2016 session, Ms. Weese explained that she was having a difficult time dealing with the recent separation from her significant other and the restraining order that had been entered against her.  (Tr. 503.)

Ms. Weese attended a new assessment with Barbara Gardner, LSW, at Solutions on March 23, 2017.  (Tr. 680-682, 793-795.)  She reported that she was there because: "I am applying for disability and my attorney suggested I come back here and [to] my doctor."  (Tr. 680.)  Her "presenting problem" was that she could not get her ex-boyfriend, ex-husband, or a 1992 car accident out of her head.  (*Id*.)  She reported having a "small, strong circle of friends." (*Id*.)  She also reported having an Individual Education Plan ("IEP") while in school, because of "learning disability - due to accident - brain injured and judgment off."  (*Id*.)   With respect to her mental health treatment history, Ms. Weese indicated that she received therapy back in 1992-1993 but could not recall it, and had received treatment briefly at Solutions a few months earlier. (Tr. 680; *see* Tr. 492-502 (treated in May 2016).)  Mental status examination findings were within normal limits or average, including fair judgment.  (Tr. 681.)  LSW Gardner noted that Ms. Weese was diagnosed with intermittent explosive disorder in June 10, 2016.  (Tr. 682.)

17

On April 5, 2017, Ms. Weese saw Anthony Smartnick, III, M.D., at Solutions for a psychiatric evaluation.  (Tr. 791-792.)  She reported a history of depressive symptoms, feeling overwhelmed and anxious, and prior psychiatric trauma from an abusive prior relationship.  (Tr. 791.)  Her self-reported symptoms included: possible PTSD symptoms, anhedonia, anergia due to need for sleep, irritable mood, agitation, and flashbacks over past abuse.  (*Id.*)  On mental status examination, Dr. Smartnick observed: angry/hostile, anxious, and irritable mood; and constricted range of affect.  (Tr. 792.)  Other examination findings were unremarkable.  (*Id.*)  Dr. Smartnick diagnosed anxiety disorder, prescribed Celexa, and recommended counseling.  (*Id.*)  A month later, Dr. Smartnick noted a good response to Celexa with no side effects except for residual morning sedation; he advised her to take Celexa after supper to combat sedation.  (Tr. 788-89.)  Her mental status examination findings were unremarkable.  (Tr. 788.)

Ms. Weese attended counseling sessions with LSW Gardner in April, May, and June 2017.  (Tr. 785-787, 790.)  In April, she noted that Dr. Smartnick had started her on a new medication and "it [had] been amazing."  (Tr. 790.)  She was not obsessing about things and not getting upset about everything.  (*Id.*)  She was sleeping better and taking care of the house and her stepchildren, which made her feel good.  (*Id.*)  In May, she continued to report that her medication was helping, but reported recently waking up out of a sound sleep; she continued to have more energy and was feeling good about that.  (Tr. 787.)  In June, she reported that she was trying to separate from negative family and friends.  (Tr. 785, 786.)  In late-June, she shared that she was "tired all the time with little motivation" but was hopeful that would change.  (Tr. 785.)

She returned for medication management with Dr. Smartnick on July 11, 2017.  (Tr. 783-784.)  She continued to report a good response to Celexa, with a stable mood and no side effects; she noted some recent changes in her seizure medication.  (Tr. 783.)  Her mental status

18

examination findings were unremarkable.  (*Id*.)  Dr. Smartnick continued her diagnosis (anxiety disorder) and medications, and noted she was in "Full Remission."  (Tr. 783-84.)

Ms. Weese saw Dr. Smartnick for additional medication management appointments on October 10, 2017 (Tr. 971-72), November 16, 2017 (Tr. 967-68), January 17, 2018 (Tr. 961-64), April 11, 2018 (Tr. 956-59), June 20, 2018 (Tr. 951-54), August 1, 2018 (Tr. 943-46).  In October, Dr. Smartnick noted an irritable mood and increased Celexa.  (Tr. 971-72.)  In November, Ms. Weese reported a relapse of symptoms after coming off Celexa and agreed to resume her medication.  (Tr. 967.)  In January and April, Ms. Weese reported a stable mood and doing well on Celexa.  (Tr. 956, 961.)  In June, she reported a partial relapse with depression, with loss of energy and interest relating to stress with a toxic relationship; Dr. Smartnick increased Celexa.  (Tr. 951, 954.)  In September, she reported an improved mood with less irritation and less depression, but reported her main issue was fatigue.  (Tr. 943.)  Dr. Smartnick indicated that it was unclear if the problem related to Celexa, and recommended reevaluating Celexa after Ms. Weese was off Topamax.  (*Id.*)  It does not appear that Ms. Weese returned.

Ms. Weese attended psychotherapy with LPC Gardner at Solutions on October 10, 2017 (Tr. 973) but failed to attend other psychotherapy appointments (Tr. 966, 970, 976) and her psychotherapy case was closed on March 27, 2018 (Tr. 960).  She attended additional therapy sessions on June 18 (Tr. 955) and June 28, 2018 (Tr. 949-50), but then did not return.

Ms. Weese restarted mental health treatment in January 2020, attending an initial evaluation with Todd Wabeke, LISW, at Cleveland Clinic Foundation (CCF) Strongsville FHC on January 23, 2020.  (Tr. 1627-29.)  She complained of depression, anxiety, sleeping too much, and diminished interest.  (Tr. 1628.)  On examination, she was depressed and anxious/nervous, with a restricted affect and tangential associations, but fully oriented with normal behavior and

19

appropriate speech, insight, and judgement.  (Tr. 1629.)  Thereafter, she attended cognitive behavioral therapy appointments with LISW Wabeke through May 2020, presenting as anxious, nervous, irritable, fearful, and/or depressed, with a restricted affect, but otherwise normal mental status findings.  (Tr. 1615-16 (2/21/20); Tr. 1606-07 (3/2/20) ; Tr. 1602-03 (3/16/20); Tr. 1597-98 (3/30/20); Tr. 1596 (4/3/20); Tr. 1592-93 (4/30/20); Tr. 1588-89 (5/14/20).)  Ms. Weese failed to attend her therapy appointment with LISW Wabeke on June 12, 2020 (Tr. 1576) and apparently did not return.

Ms. Weese had a psychiatric assessment on February 28, 2020, with Ann Pressler, CNP, at CCF Rocky River.  (Tr. 1607-10.)  At that time, she reported irritability, difficulty with focus, and fatigue, saying "[I] can't stay awake."  (Tr. 1608 (reporting 8-10 hours of sleep a night and 2-5 hours of napping during day).)  She also reported obsessive thoughts.  (*Id.*)  On examination, she was fully oriented with appropriate behavior and intact judgment, but her speech was rambling and overly detailed, she was fearful and tearful, her associations were circumstantial and tangential, and her insight was limited.  (Tr. 1609.)  CNP Pressler tapered her off Celexa, prescribed Cymbalta, and instructed her to decrease her daytime napping.  (Tr. 1610.)

Ms. Weese followed up with CNP Pressler for psychiatric medication management about once a month through June 2020.  (Tr. 1598-99 (3/23/20); Tr. 1594-96 (4/6/20); Tr. 1589-91 (5/5/20); Tr. 1585-86 (5/26/20); Tr. 1581-82 (6/9/20).)  Her mental status examination findings were unremarkable.  (*Id.*)  In March, Ms. Weese reported that her sleep had improved; she was sleeping through the night better, getting about 7-8 hours of sleep, and was not groggy in the morning.  (Tr. 1598.) In April, she reported "continuing irritability but not as intense" and "panic like attacks" over issues like not enough cigarettes.  (Tr. 1594.)  In May, she reported that her mood was good but she "just continue[d] to feel so tired through the day"; some days she did not

have the motivation to get dressed and "would just like more energy." (Tr. 1590.) Later that month, she reported no change in her level of energy, and said she was getting about 8 hours of sleep, then napping 1-3 hours during the day. (Tr. 1585.) CNP Pressler made some medication changes. (*See* Tr. 1591 (increase Cymbalta); Tr. 1595 (increase Cymbalta); Tr. 1586 (start Abilify).) She also discussed decreasing caffeine intake, sleep hygiene, decreasing the length of daytime naps, and increasing exercise. (Tr. 1585.) In June, Ms. Weese reported improved mood and energy since adding Abilify, noting that she "lost 10 pounds in three weeks due to increased activity. Outside walking more and has decreased napping during the day. Sleeping through the night averaging 10 hours of sleep each night for last week." (Tr. 1581.) Because Ms. Weese continued to experience irritability, CNP Pressler again increased Abilify. (Tr. 1581-82.)

Ms. Weese next attended a medication management appointment with Christine Yammarino, CNP, on August 7, 2020, complaining that she was feeling increasingly irritable. (Tr. 1969-71.) CNP Yammarino increased Abilify and advised her to follow up in one week. (Tr. 1969.) On August 18, 2020, Ms. Weese reported that the increase in Abilify helped control her irritability and anger. (Tr. 1667-68.) She also denied any issues with sleep, reporting that she was getting 7-8 hours at night and continued to nap for an hour during the day without issues. (Tr. 1967.) CNP Yammarino continued her medications. (Tr. 1967-68.)

Ms. Weese followed up with CNP Yammarino in October 2020 (Tr. 2036-38) and February 2021 (Tr. 2007-10). In October 2020, Ms. Weese complained of increased irritability and CNP Yammarino increased Abilify. (Tr. 2036.) In February 2021, Ms. Weese reported she was managing her mood better with Abilify, but had decreased her dose. (Tr. 2008.) CNP Yammarino discussed a plan to decrease Cymbalta to coincide with her increase in Abilify. (*Id.*) CNP Yammarino continued Abilify at the reduced dose and reduced Cymbalta. (Tr. 2010.)

Ms. Weese began mental health treatment at Bellefaire JCB in November 2021, with a diagnostic evaluation by Jennifer Killeen, LPC.  (Tr. 2545-54.)  She complained of worsening anxiety and depression over the past six months, with shakiness, low motivation, lack of energy, decrease in appetite or overeating, and excessive sleep of 12-14 hours throughout the day.  (Tr. 2545.)  She reported therapeutic and psychiatric services at Cleveland Clinic in 2020, but felt that the medications prescribed were "making it worse" and "made [her] feel like a zombie."  (Tr. 2551.)  She reported living at home with her husband and two stepchildren, and said her husband was employed as a truck driver where he was home one week out of the month.  (*Id.*)  LPC Killeen recommended counseling and psychiatric evaluation.  (Tr. 2553.)

Ms. Weese attended a psychiatric evaluation with Jonathan M. Nehrer, MD, on December 6, 2021.  (Tr. 2560-66.)  She complained of increasing anxiety and depression for six months, making it harder to care for her stepchildren.  (Tr. 2561.)  She was sleeping more than 12 hours and struggling to get motivated to do various tasks.  (*Id.*)  She was taking Abilify, Cymbalta, and Wellbutrin.  (*Id.*)  Her mental status examination findings were normal, except that she was dysphoric and anxious/nervous/worried.  (Tr. 2564-65.)  Dr. Nehrer diagnosed major depressive disorder, generalized anxiety disorder, and post-traumatic stress disorder.  (Tr. 2565.)  He started Celexa and made other medication changes.  (Tr. 2566.)  She attended other medication management visits in January 2022.  (Tr. 2579-83 (1/3/22); Tr. 2592-96 (1/31/22).)  On January 3, Ms. Weese reported feeling "100 times better" on Celexa, compared to Wellbutrin, and said she was "NOT tired, not lethargic, [and] has more energy and is more social."  (Tr. 2580.)  On January 31, she reported that she was content and her medications were working well with no side effects.  (Tr. 2593.)  Dr. Nehrer continued her medications.  (Tr. 2596.)

22

Ms. Weese attended weekly psychotherapy sessions with LPC Killeen from December 2021 through March 2022, working on journaling and mindfulness.  (Tr. 2577-78 (12/24/21); Tr. 2584-85 (1/5/22); Tr. 2586-87 (1/13/22); Tr. 2588-89 (1/19/22); Tr. 2590-91 (1/26/22); Tr. 2597-98 (2/2/21); Tr. 2599-2600 (2/9/22); Tr. 2601-02 (2/16/22); Tr. 2603-04 (2/23/22); Tr. 2605-06 (3/2/22); Tr. 2607-08 (3/9/22).)   During therapy sessions, she exhibited irritability (*see e.g.*, Tr. 2588, 2597, 2601), anxiety/fear (*see e.g.*, Tr. 2590, 2597, 2599, 2607), sad or pained or worried expression (*see e.g.*, Tr. 2597, 2599), self-deprecation (*see e.g.*, Tr. 2599), decreased energy/fatigue (*see e.g.*, Tr. 2601, 2603, 2607), negative statements (*see e.g.*, Tr. 2603), or agitation (*see e.g.*, Tr. 2605).  Her reported symptoms on January 13, 2022, included decreased energy/fatigue, and she demonstrated a "sad/pained/worried expression."  (Tr. 2586.)

### 2.    Opinion Evidence

#### i.    Consultative Examinations

Consultative examiner, Erik Johnson, M.D., examined Ms. Weese on October 2, 2021.  (Tr. 2093-2096.)  Ms. Weese reported a lifetime of lower back pain with extensive medical intervention, and said the pain limited her ambulation and her ability to sit or lay comfortably.  (Tr. 2093.)  She also reported increasing right foot pain, which she attributed to a failed surgery.  (*Id.*)  She reported the ability to lift no more than five pounds, walk about 30 yards unassisted, sit for 30 minutes at a time, and stand for 2 hours.  (*Id.*)  She drove, did household chores like cooking and cleaning, used stairs, and maintained her own hygiene.  (Tr. 2094.)  Although Ms. Weese provided him some of her medical history, Dr. Johnson noted that her "extensive medical records" were not available for his review.  (*Id.*)

Physical examination findings included point tenderness in the lumbar spinous processes, markedly reduced range of motion with left hip flexion and somewhat reduced range of motion

23

with right hip flexion, both secondary to pain, abnormal straight leg raise, 4/5 strength with left hip flexion secondary to pain, and slow gait; other examination findings were normal and/or unremarkable. (Tr. 2095, 2098-2102.) Dr. Johnson noted that she reported persistent sleepiness, which "may be due to her epilepsy, may be due to migraines, may be medication side effects." (Tr. 2095). Dr. Johnson opined that Ms. Weese "could perform a sedentary level of work." (*Id.*)

### ii. State Agency Medical Consultants

Upon initial review, on April 28, 2017, state agency medical consultant Indira Jasti, M.D., completed a Physical RFC Assessment. (Tr. 270-272.) Dr. Jasti opined that Ms. Weese had the physical RFC to: occasionally lift and/or carry 50 pounds; frequently lift and/or carry 25 pounds; stand and/or walk about 6 hours in an 8-hour workday; sit about 6 hours in an 8-hour workday; occasionally climb ramps/stairs; never climb ladders/ropes/scaffolds; and frequently stoop, kneel, crouch and crawl. (Tr. 270-71.) Dr. Jasti also opined that Ms. Weese should avoid concentrated exposure to noise and avoid all exposure to hazards. (Tr. 271.)

Upon reconsideration, on May 23, 2017, state agency medical consultant Elizabeth Roseberry, M.D., completed a Physical RFC Assessment. (Tr. 297-299.) Dr. Roseberry's limitations were the same as Dr. Jasti's except that Dr. Roseberry also found Ms. Weese could: occasionally push or pull with her left lower extremity due to left leg pain and peripheral neuropathy; and frequently balance. (Tr. 298.)

State agency medical consultants Elizabeth Das, M.D. and Maureen Gallagher, D.O., reviewed the record in October 2020 and October 2021, respectively. (Tr. 1237, 1255-56.) Dr. Das adopted the RFC from the 2018 ALJ opinion, opining that Ms. Weese could perform light work, except that she could: occasionally push, pull and operate foot controls with the left lower extremity; never climb ladders, ropes, or scaffolds; occasionally climb ramps and stairs;

occasionally kneel, crouch, and crawl; frequently balance and stoop; frequently handle and finger with the bilateral upper extremities; and must avoid concentrated exposure to loud and very loud noise and very bright lights; and must avoid all exposure to hazards such as unprotected heights, moving mechanical parts, and motor vehicles.  (Tr. 1234, 1237.)

Dr. Gallagher opined that Ms. Weese could perform light work with the following additional limitations: never climb ladders, ropes, or scaffolds; frequently climb ramps or stairs; frequently kneel or crouch; occasionally stoop or crawl; and avoid all exposure to hazards such as unprotected heights, heavy machinery, and commercial driving.  (Tr. 1255-56.)

### iii.    State Agency Psychological Consultants

Upon initial review, on April 26, 2017, state agency psychological consultant Karla Delcour, Ph.D., completed a Psychiatric Review Technique ("PRT") (Tr. 268-269) and Mental RFC Assessment (Tr. 272-273).  In the PRT, Dr. Delcour found that Ms. Weese had: no limitations in her ability to understand, remember or apply information; mild limitations in her ability to adapt or manage oneself; and moderate limitations in her ability to interact with others and concentrate, persist or maintain pace.  (Tr. 268.)  In the mental RFC, Dr. Delcour opined that Ms. Weese could perform: simple, repetitive, one to two step tasks; and tasks requiring no more than superficial social interactions with coworkers, supervisors, and the public.  (Tr. 272-273.)

Upon reconsideration, on May 19, 2017, state agency psychological consultant Robyn Murry-Hoffman, Ph.D., agreed with Dr. Delcour's PRT (Tr. 295-296) and opined that Ms. Weese could perform: simple, repetitive tasks; and tasks that require no more than superficial social interactions with coworkers, supervisors, and the public.  (Tr. 299-301.)

State agency consultant Cindy Matyi, PhD., reviewed the file on October 7, 2020, and completed a Psychiatric Review Technique ("PRT") (Tr. 1236) and Mental RFC Assessment (Tr.

1238).  In the PRT, Dr. Matyi found that Ms. Weese had: mild limitations in her ability to

understand, remember or apply information; and moderate limitations in her ability to adapt or

manage oneself, interact with others, and concentrate, persist or maintain pace.  (Tr. 1236.)  In

the mental RFC, she adopted the 2018 ALJ Decision, finding Ms. Weese could: perform simple,

routine, and repetitive tasks, but not at a production rate pace; interact on an occasional basis

with supervisors, coworkers, and the general public, but should be limited to superficial contact

meaning no sales, arbitration, negotiation, conflict resolution, or confrontation, no group,

tandem, or collaborative tasks, and no management, direction, or persuasion of others; respond

appropriately to occasional change in a routine work setting, as long as such changes are easily

explained and/or demonstrated in advance of gradual implementation.  (Tr. 1238.)

On October 22, 2021, on reconsideration, Irma Johnston, Psy D., agreed with Dr. Matyi's

PRT findings (Tr. 1253) and opined that Ms. Weese: could carry out simple and moderately

complex instructions in a work setting that does not require sustained attention or concentration,

where tasks can be completed in short periods of time, and where absences would be expected

with exacerbations of symptoms, but not excessive; retained the ability to relate to others on a

superficial level; could work within a set routine where major changes are explained in advance

and gradually implemented to allow the claimant time to adjust to the new expectations; and

could handle tasks without strict time limitations or production standards.  (Tr. 1257-58.)

## C.     Hearing Testimony

### 1.     Plaintiff's 2018 Testimony

At the October 5, 2018 hearing, Ms. Weese testified in response to questioning from the

ALJ and her attorney.  (Tr. 213, 216-250.)   Although she could drive, Ms. Weese testified that a

friend drove her to the hearing.  (Tr. 218.)  She had a medical restriction on her driver's license

for seizures, but had not had a seizure for a couple of years.  (Tr. 219, 231.)  She had recently been taken off her seizure medication but was put back on it for her migraines.  (Tr. 219, 230.)

During her most recent employment, Ms. Weese said she missed a lot of work because she did not know if she was having a seizure or doctor appointments, and because she kept falling asleep at her desk because she "was so overtired."  (Tr. 220, 241-242.)  When asked what prevented her from working, Ms. Weese cited her migraines and fatigue.  (Tr. 229.)  Her stepchildren took care of their own needs in the morning.  (Tr. 218.)  She usually sat on the couch and waited for their bus to come, and sometimes fell asleep.  (*Id.*)  During a typical day, Ms. Weese usually went to bed around 8:30 or 9:00 p.m., then slept until 6:00 or 6:30 a.m.  (Tr. 239.)  She was then up until 9:30 or 10:00 a.m., at which point she fell asleep and would not wake up until she heard an alarm or someone woke her up. (Tr. 239.)

Ms. Weese testified that she started to get a migraine while at the hearing.  (Tr. 229.)  When asked how long one of her migraines last, Ms. Weese indicated that she usually sleeps all day and when she wakes up her migraine is mostly gone but she is dizzy and confused.  (*Id.*)  Her neurologist initially had her on Dilantin to treat her headaches.  (Tr. 229-230.)  But she was not happy with that treatment and switched to a new neurologist.  (Tr. 229-230, 241-242).  Her new neurologist, Dr. Garratt, took her off Dilantin and put her on Topamax.  (Tr. 230.)  The Topamax helped with her seizures and migraines.  (*Id.*)  Ms. Weese stopped taking Topamax for a while, but had to start taking it again because of headaches.  (Tr. 219, 230.)

In addition to the Topamax, Ms. Weese took other medications for her migraines.  (Tr. 240-241.)  The medications helped to some extent.  (Tr. 241.)  Without the medication, her migraines were very severe: "It's almost like I'm having a seizure while the migraine[] is taking place, which is scary."  (*Id.*)  But medications caused her to be tired all the time.  (*Id.*)  She slept

a lot because of her headaches. (Tr. 249.) If she had to sit at a desk and do work, she said she would fall asleep. (Tr. 242.) She estimated being able to stay awake maybe four-and-a-half hours before falling asleep. (*Id.*) After that, Ms. Weese would still sleep for almost eight hours. (Tr. 242-243.)

Ms. Weese was scheduled to have two different sleep studies conducted. (Tr. 244-245.) One of the studies was a "regular" sleep study scheduled by her primary care physician and the other was a "sleep deprived" study scheduled by her neurologist. (*Id.*) Ms. Weese's primary care physician was trying to find out why she was tired all the time. (Tr. 245.) Ms. Weese's neurologist wanted the other study performed to evaluate her sleepiness, and wanted to make sure she was not having any seizures. (Tr. 245-246.)

Dr. Garratt referred Ms. Weese to Dr. Reed, a migraine specialist. (Tr. 230.) Her doctors recommended Botox injections for her headaches, but her insurance denied coverage. (*Id.*) Per her doctor's recommendation, the day prior to the hearing, Ms. Weese started monthly subcutaneous injections for migraines. (Tr. 230-231.) When asked whether she noticed any improvement since giving herself the first injection, Ms. Weese stated: "I'm still dizzy. I mean, I was sitting out in the waiting room sleeping." (Tr. 231.)

Ms. Weese reported trying to lose weight. (Tr. 232.) Her neurologist recommended that she run in place every day for ten minutes, but it made her head hurt even worse when she tried to do that. (*Id.*) A day or two before the hearing, she said she was on the bathroom floor because her headache was so bad. (*Id.*)

She also testified that she sometimes fell due to her dizziness, with her last fall being about a week before the hearing. (Tr. 232.) She had not had a fall that required calling an ambulance or seeking emergency medical treatment, but she testified that going up and down

stairs was difficult.  (Tr. 233.)  She had surgery on both her knees.  (Tr. 233.)  She wore a brace on her right knee when the weather was bad.  (*Id.*)  Sometimes, but not often, she also had to wear a brace on her left knee.  (*Id.*)  Ms. Weese's doctor suggested physical therapy and possibly more surgery for her knees.  (Tr. 233-234.)  She was not interested in physical therapy because prior physical therapy hurt and made things worse.  (Tr. 234.)

For her pain, Ms. Weese reported taking Ibuprofen or a muscle relaxer at night.  (Tr. 239.)  She had neuropathy in her legs and hands.  (Tr. 234.)  The pain was in her lower left back and went down into her leg and knee, making her leg tingly.  (Tr. 247.)  When asked whether she has problems with standing or walking, Ms. Weese replied: "I force myself to.  I have a high pain tolerance, so I really force myself."  (*Id.*)  However, she said she did not stand a lot; if she stood the pain started to "shoot across [her] lower left back."  (Tr. 248.)  When she was at home, she would usually lay on the couch or stretch her left knee if she was sitting.  (*Id.*)

She also had tingling down her arms with shooting pains.  (Tr. 234.)  She could button a shirt and brush her hair but she dropped things.  (Tr. 234, 248.)  As a result of the head injury she suffered when she was nine years old, she reported short- and long-term memory problems.  (Tr. 234-235, 242-243, 244.)

Ms. Weese visited with her parents a couple of times each week.  (Tr. 237.)  She tried to help her parents with things when she visited, but they were very independent and would not let her help.  (Tr. 238.)  She saw her sister once or twice each week when her sister came to visit at their parents' house.  (*Id.*)  She did not see her brother as much but they talked on the phone. (*Id.*)  In addition to the friend that brought her to the hearing and her boyfriend, she had a neighbor that she saw, but not often.  (Tr. 238.)

Ms. Weese did not perform many household chores.  (Tr. 246-247.)  She tried to do some chores in the morning when she first got up, and the kids helped a lot.  (Tr. 246.)  She helped a little with the laundry.  (Tr. 247.)  If there was laundry in the washer, she might pull it out that day, but sometimes she forgot to take it out and it had to be washed again.  (*Id.*)  On occasion, she went grocery shopping with her boyfriend, but he often picked things up from the store on his way home.  (*Id.*)  If Ms. Weese went to the grocery store, she had to have a written list.  (*Id.*)

### 2.  Plaintiff's 2022 Testimony

At her telephonic hearing on May 6, 2022, Ms. Weese again testified in response to questioning from the ALJ and her representative.  (Tr. 1160-1192.)  She was living with her husband and two stepchildren, aged 12 and 15.  (Tr. 1169.)  Her husband was an over the road truck driver who was gone for periods of time.  (*Id.*) Ms. Weese was able to drive, and performed errands like going to the grocery store at least twice a week.  (Tr. 1170.)  The last time she worked full time was 2016 or 2017.  (Tr. 1171.)  Her previous jobs included: collection clerk, administrative assistant, and customer service representative.  (Tr. 1179-1181.)

Ms. Weese said she was unable to work due to her back and depression, explaining that she was treating her low back pain at The Cleveland Clinic and Advanced Spine.  (Tr. 1184.)  She had attended physical therapy, had injections, and had an ablation.  (*Id.*)  Medications did not help, and she still had pain which could be relieved if she iced or when she lay down.  (Tr. 1177.)  She had difficulty sleeping through the night and took naps every day.  (*Id.*)

Ms. Weese said she could stand for an hour or so but had a hard time even walking to the mailbox.  (Tr. 1177-1178.)  She did not use any ambulatory devices.  (Tr. 1178.)  She still had issues with her knees, with her left knee being worse than the right, and she wore a brace when needed.  (*Id.*)  She wore the brace if she was going out; otherwise, her knee would buckle, and her legs would go out from under her.  (*Id.*)   She had neuropathy in both her hands and feet,

30

worse in her feet.  (Tr. 1179.)   The neuropathy caused her to have a hard time gripping and she was constantly dropping stuff.  (*Id*.)  She did not wear compression socks or an ankle brace, but wore New Balance shoes that she was fitted with.  (*Id.*)  It had been years since Ms. Weese last had a seizure.  (*Id.*)  The seizure medication made her tired all the time.  (Tr. 1180.)

Ms. Weese took medication that caused her to be tired all the time and had a hard time concentrating.  (Tr. 1180.)  Her migraines were controlled by medicine, but still occurred three to five times a week.  (*Id.*)  When she had a migraine, she went to sleep for eight or nine hours because the medication knocked her out, and the migraine was gone when she woke up.  (Tr. 1181.)  Before they were controlled with medication, her migraines occurred almost every day.  (*Id*.)  Her doctor suggested Botox treatment but her insurance did not cover it.  (*Id.*)

Regarding depression and anxiety, she had frequent crying spells and had panic attacks about every other week.  (Tr. 1181-82.)  She had never been recommended for group therapy or hospitalized overnight for behavioral health concerns.  (Tr. 1183.)  She had weekly nightmares attributed to PTSD.  (*Id.*)  She also had memory loss, lack of motivation, and lack of concentration from mental health issues.  (*Id.*)

Upon questioning by her attorney, Ms. Weese testified that she was still having problems with fatigue and could not take stimulants because of her seizures.  (Tr. 1185.)  Her left hand shook all the time.  (*Id*.).  She could stand and wash dishes for half an hour before she had to stop to rest for three to four hours.  (Tr. 1185-86.)  She drove to the doctor and took the kids to school when necessary.  (Tr. 1185.)  Her cousin took her shopping to help with lifting.  (Tr. 1186.)  She could lift a gallon of milk maybe three times and then would have to rest.  (*Id.*)  Her right hand became numb when writing.  (Tr. 1188.)

Ms. Weese testified that she had been fired from jobs because she fell asleep at her desk and/or missed days.  (Tr. 1187.)  She had problems with her memory and remembering how to do specific things.  (*Id*.).  She had to be reminded and shown things over and over, but then would forget within two days.  (*Id*.)  Her condition was worse since the last hearing because her back was unbearable; she explained that she was frequently siting and standing during the telephonic hearing to manage her pain.  (Tr. 1187-88.)

**3.     2022 VE Testimony**

A VE testified that a hypothetical individual of Ms. Weese's age, education, and work experience with the functional limitations described in the RFC determination could not perform her prior work, but could perform representative positions in the national economy, including office helper, price marker, and mail clerk.  (Tr. 1192-93.)  The VE also testified that it would preclude competitive employment if the hypothetical individual would be off task 10% of the workday or absent more than one day per month.  (Tr. 1194.)

### III.     Standard for Disability

Under the Social Security Act, 42 U.S.C § 423(a), eligibility for benefit payments depends on the existence of a disability.  "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).

> An individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy[.]

42 U.S.C. § 423(d)(2)(A).

To make a determination of disability under this definition, an ALJ is required to follow a five-step sequential analysis set out in agency regulations, summarized as follows:

1. If the claimant is doing substantial gainful activity, he is not disabled.

2. If the claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3. If the claimant is not doing substantial gainful activity, is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment, the claimant is presumed disabled without further inquiry.

4. If the impairment does not meet or equal a listed impairment, the ALJ must assess the claimant's residual functional capacity and use it to determine if the claimant's impairment prevents him from doing past relevant work.  If the claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5. If the claimant is unable to perform past relevant work, he is not disabled if, based on his vocational factors and residual functional capacity, he is capable of performing other work that exists in significant numbers in the national economy.

20 C.F.R. § 404.1520; *see also Bowen v. Yuckert*, 482 U.S. 137, 140-42, 107 S. Ct. 2287, 96 L. Ed. 2d 119 (1987).  Under this sequential analysis, the claimant has the burden of proof at Steps One through Four.  *See Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997).  The burden shifts to the Commissioner at Step Five to establish whether the claimant has the Residual Functional Capacity ("RFC") and vocational factors to perform other work available in the national economy.  *Id.*

## IV.    The ALJ's Decision

In his August 29, 2022 decision, the ALJ made the following findings:[5]

1. The claimant meets the insured status requirements of the Social Security Act through December 31, 2021.  (Tr. 1133.)

---

[5] The ALJ's findings are summarized.

2.      The claimant has not engaged in substantial gainful activity since January 3, 2017, the alleged onset date.  (*Id*.)

3.      The claimant has the following severe impairments: Obesity; Lumbar degenerative disc disease, spondylosis and annular tear of lumbar disc with radiculopathy; Osteoarthritis and medial meniscus tear of left knee; History of right knee meniscus tear; Right ankle and foot osteoarthrosis, hallux malleus and nonunion after arthrodesis; Gastro-esophageal reflux disease (GERD); Peripheral neuropathy; Post-traumatic seizure disorder; Epilepsy; Migraine; Vertigo; Obstructive sleep apnea; Depressive disorder and mood disorder; Anxiety disorder; Intermittent explosive disorder; and Post-traumatic stress disorder (PTSD).  (*Id*.)

4.      The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1, 404.1525, 404.1526, 416.920(d), 416.925 and 416.926.  (Tr. 1134.)

5.      The claimant has the residual functional capacity to perform light work except: She can occasionally operate foot controls with the left lower extremity. She can never climb ladders, ropes or scaffolds, but can occasionally climb ramps and stairs. The claimant can occasionally stoop, kneel, crouch and crawl. She can frequently balance. The claimant could frequently handle and finger with the bilateral upper extremities. She must avoid concentrated exposure to extreme cold, vibrations, loud and very loud noise, and bright lights (defined as brighter than the typical office setting), and avoid all exposure to hazards such as unprotected heights, moving mechanical parts and the operation of motor vehicles. She can perform simple, routine and repetitive tasks, but not perform tasks which require a high production rate pace (such as assembly line work). She can interact on an occasional basis with supervisors, coworkers and the general public, but should be limited to superficial contact (meaning no sales, arbitration, negotiation, conflict resolution or confrontation, no group, tandem or collaborative tasks, and no management, direction or persuasion of others). The claimant can respond appropriately to occasional change in a routine work setting, as long as any such changes are easily explained and/or demonstrated in advance of gradual implementation.  (Tr. 1135-36.)

6.      The claimant is unable to perform any past relevant work.  (Tr. 1148.)

7.      The claimant was born in 1981 and was 34 years old, defined as a younger individual, on the alleged disability onset date.  (*Id*.)

8.      The claimant has at least a high school education.  (*Id*.)

9.      Transferability of job skills is not material to the determination of disability. (*Id*.)

34

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform, including hand packer, store laborer, and hospital cleaner. (*Id.*)

Based on the foregoing, the ALJ determined that Plaintiff had not been under a disability, as defined in the Social Security Act, from January 3, 2017, through the date of the decision on August 29, 2022. (Tr. 1149.)

## V. Plaintiff's Arguments

Ms. Weese has presented the following developed arguments for review:[6]

1. Whether the ALJ failed committed harmful error by failing to comply with the District Court's 2021 remand order;

2. Whether the ALJ's Step Three evaluation of Ms. Weese's migraine headaches gives rise to reversible error because he did not discuss Social Security Ruling ("SSR") 19-4p; and

3. Whether the ALJ erred in assessing Ms. Weese's subjective symptoms related to "headaches, pain and fatigue" under SSR 16-3p.

(ECF Doc. 8, pp. 1, 13-25.)

## VI. Law & Analysis

### A. Standard of Review

A reviewing court must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record. *See Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 405 (6th Cir. 2009) ("Our review of the ALJ's decision is limited to whether the ALJ

---

[6] Although Ms. Weese has raised other perfunctory arguments in her brief, the Court addresses only those arguments that were clearly articulated and adequately developed; all other arguments are deemed waived. *See Hollon ex rel. Hollon v. Comm'r of Soc. Sec.*, 447 F.3d 477, 491 (6th Cir. 2006); *see also McPherson v. Kelsey*, 125 F.3d 989, 995 (6th Cir. 1997) ("Issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived.").

applied the correct legal standards and whether the findings of the ALJ are supported by substantial evidence.").

When assessing whether there is substantial evidence to support the ALJ's decision, the Court may consider evidence not referenced by the ALJ. *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001). "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Hum. Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992) (quoting *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989)). The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)). "'The substantial-evidence standard . . . presupposes that there is a zone of choice within which the decisionmakers can go either way, without interference by the courts.'" *Blakley*, 581 F.3d at 406 (quoting *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)). Therefore, a court "may not try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility." *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984). Even if substantial evidence supports a claimant's position, a reviewing court cannot overturn the Commissioner's decision "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).

Although an ALJ decision may be supported by substantial evidence, the Sixth Circuit has explained that the "'decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.'" *Rabbers v. Comm'r Soc. Sec. Admin.*, 582 F.3d 647, 651 (6th Cir. 2009) (quoting *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2007) (citing

36

*Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 546-547 (6th Cir. 2004)).  A decision will also not be upheld where the Commissioner's reasoning does not "build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996)).

**B.      First Assignment of Error: Whether ALJ Erred in Assessing Symptoms in Light of 2021 Remand Order**

In her first assignment of error, Ms. Weese asserts that the ALJ did not comply with the District Court's July 6, 2021 remand order "in that he once again failed to properly consider [her] symptoms, especially her fatigue."  (ECF Doc. 8, p. 12.)  She admits that the ALJ acknowledged her reports of fatigue, limited concentration, and medication side effects, and that he cited to medical records that documented her fatigue, but argues that the ALJ nevertheless erred because he "still tried to discount her fatigue" and "ignored relevant medical evidence documenting [her] symptoms and fatigue."  (*Id.* at pp. 12-13.)  She does not, however, specify what "relevant medical evidence" the ALJ ignored.  The Commissioner argues in response that the ALJ's evaluation of the record, including evidence of Ms. Weese's subjective complaints of fatigue, was procedurally proper and supported by substantial evidence.  (ECF Doc. 11, p. 13.)

In remanding the 2018 ALJ Decision, the District Court found that the ALJ had "either overlooked or misconstrued evidence relating to [Ms. Weese's] subjective allegations of extreme fatigue," leaving the Court unable to determine whether the ALJ's assessment of Ms. Weese's subjective allegations of fatigue, and his ultimate finding of non-disability, were supported by substantial evidence.  (Tr. 1275; *see also* Tr. 1270-74 (Appeals Council Remand Order, ordering proceedings consistent with District Court remand order).)  In so finding, the District Court focused on the ALJ's following statement in the 2018 ALJ Decision:

> While the fatigue described during the hearing was reported to a medical professional, it appears to have only gotten to the point of excessive daytime sleeping very recently. There is no indication that this condition has lasted, or will last at least 12 months at the level currently described. Further, this increase in fatigue and headaches occurred after the claimant ceased Topamax due to her plans to become pregnant. . . .

(Tr. 1301 (quoting Tr. 199-200).)  The District Court highlighted multiple instances in the medical record where Ms. Weese reported excessive sleepiness and/or sleeping through the day, finding the evidence "inconsistent with the ALJ's suggestion that [Ms. Weese]'s fatigue only recently became excessive," and finding "the ALJ's suggestion that the increase in fatigue and headaches was the result of stopping Topamax . . . is also not fully supported."  (Tr. 1302-03.)

Upon remand, the ALJ considered Ms. Weese's subjective reports of fatigue (Tr. 1135-36), but concluded that her "statements concerning the intensity, persistence and limiting effects" of her fatigue and other symptoms were "not entirely consistent with the medical evidence and other evidence in the record" (Tr. 1136.)  In support, the ALJ considered relevant medical records dating from June 2017 through November 2021.  (Tr. 1142-44.)  In particular, he noted:

- Her complaints of extreme fatigue in June 2017 (Tr. 1142);

- An adverse reaction to medication in July 2017 that resulted in sedation and fatigue, but with a "good response" upon a change in medications (Tr. 1143);

- Her sleep apnea diagnosis in October 2018, after which she reported a "complete difference" and refreshed sleep once she began using a CPAP regularly (*id.*);

- Her complaint of daytime sleepiness in October 2019, but with an "alert and oriented" mental status examination and a notation to consider "wake promoting agents" (*id.*);

- Her March 2020 report that her energy level skyrocketed after spinal injections (*id.*);

- Her report that her sleep was intact, but with 1-2 hour daytime naps, at a May 2020 telehealth appointment, with a recommendation that she reduce caffeine and practice good sleep hygiene with shorter naps, and a notation that fatigue was not likely due to depression as there was no change with Cymbalta (*id.*);

- Her report in June 2020 that her energy level increased and her napping decreased since starting Abilify (Tr. 1143-44);

- Her reports of "good" sleep in early 2021, with no reported naps but some "sluggish" feelings (Tr. 1144); and

- A November 2021 report of fatigue that somewhat/sometimes caused difficulty (*id.*).

After considering those records, the ALJ provided the following detailed analysis of his findings

regarding Ms. Weese's subjective allegations of fatigue:

> In this case, the claimant has consistently reported some degree of fatigue throughout the record. She often indicated that fatigue occurred on a daily or regular basis with a need for naps. There were some issues with providers determining what the aggravating factors or causation were for these symptoms. Fatigue appears to be multi-factored, with a response to treatment measures for various conditions. The claimant had a reduction of fatigue with weight loss, healthy eating and exercise, psychiatric medications (Abilify), a CPAP machine, and when spinal injections reduced her pain level. Despite fatigue, she was able to care for her own personal needs and perform tasks to help maintain the household and help care for her two stepchildren. She testified that her husband works on the road as a truck driver, implying that his time assisting with tasks at the home may be limited. The claimant was able to engage in yoga [] and plan a beach vacation. [] She could drive, go to the grocery store, and take her step-children to appointments. She remained able to care for her own personal needs and performs some household chores for 30-60 minutes before resting. She cared for dogs. []  Based on the totality of the evidence, testimony/written reports with consistent reports of fatigue/sleepiness, normal mental status exams for concentration and memory, daily activities, and good response to various measures without side effects (injections, CPAP, exercise, healthful eating, weight loss, psychiatric medication), I find that fatigue would not preclude the claimant from engaging in a normal workday and/or workweek. The claimant would have time to sleep at night, and could nap after work if necessary. Additionally, she would have the standard lunch and breaks during the workday to rest if needed.
>
> No treating, examining, or reviewing physician offered opinions suggesting that the claimant is unable to perform full-time work due to fatigue or other symptoms. The only medical opinions regarding the ability to work were from the State Agency reviewing sources and the State Agency consultative examiner. None of these acceptable medical sources opined that fatigue alone or in combination would result in the need for extra breaks, less than full-time work, or other work preclusive limits. No treating source suggested limitations beyond those proposed by the State Agency reviewing sources and the State Agency consultative examiner. Overall, I do not find that the evidence supports a finding that fatigue alone, or in combination with obesity and other conditions, would result in limitations beyond those already considered in the residual functional capacity.

(Tr. 1144-45 (citations omitted).)  The ALJ then analyzed the medical opinion evidence.  As to the state agency psychological consultants, he noted that he had included additional mental RFC limitations—beyond those suggested by the state agency consultants—in order to "adequately accommodate the totality of mental symptoms, pain and *fatigue*."  (Tr. 1145 (emphasis added).)  As to the consultative examiner, the ALJ noted that Dr. Johnson had considered her reports of fatigue but still did not opine that she would need extra breaks, unscheduled absences, or naps in order to accommodate her fatigue.  (Tr. 1147.)

Without addressing the ALJ's detailed and comprehensive analysis of her subjective reports of fatigue, Ms. Weese offers only a conclusory argument that the ALJ committed harmful error when he "ignored relevant medical evidence documenting [her] symptoms and fatigue." (ECF Doc. 8, p. 13.)  This underdeveloped argument lacks merit.  An ALJ need not discuss every piece of evidence to render a decision supported by substantial evidence.  *See Boseley v. Comm'r of Soc. Sec. Admin.*, 397 F. App'x 195, 199 (6th Cir. 2010) (citing *Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 507–08 (6th Cir. 2006) (per curiam)).  And it is not this Court's role to scour the record for evidence to support Ms. Weese's arguments.  *See Hollon v. Comm'r of Soc. Sec.*, 447 F.3d 477, 491 (6th Cir. 2006) ("[W]e limit our consideration to the particular points that [Plaintiff] appears to raise in her brief on appeal."); *McPherson v. Kelsey*, 125 F.3d 989, 995-96 (6th Cir. 1997) ("It is not sufficient for a party to mention a possible argument in the most skeletal way, leaving the court to put flesh on its bones.").

For the reasons set forth above, the Court finds that Ms. Weese has not met her burden to show that the ALJ failed to follow the District Court remand order, or that his analysis of her subjective reports of fatigue ignored relevant evidence or otherwise lacked the support of substantial evidence.  The Court finds the first assignment of error lacks merit.

40

**C.      Second Assignment of Error: Whether ALJ Appropriately Evaluated Migraine Headaches at Step Three**

In her second assignment of error, Ms. Weese argues that the ALJ "erroneously failed to discuss Social Security Ruling (SSR or Ruling) 19-4p," which "deals with all types of primary headaches in conjunction with Listing 11.02." (ECF Doc. 8, p. 14.)  In support, Ms. Weese asserts that the ALJ acknowledged that her migraines "occurred three to five times per week" but then made an "incorrect" statement that the "medical record lacks recent neurology records to establish the frequency or severity of migraines." (*Id.* (citing Tr. 1140).)[7]

The Commissioner responds that: the ALJ specifically considered Listing 11.02 and observed that no treating or examining physicians made findings that would satisfy the severity requirements of a listed impairment; the state agency medical consultants found Ms. Weese did not meet or medically equal the requirements of any listed impairments; and the evidence concerning migraine headaches was considered and discussed by the ALJ, and did not rise to the level of severity required by Listing 11.02. (ECF Doc. 11, pp. 19-21.)  The Commissioner also asserts that the ALJ's comment regarding the lack of recent neurology records to establish the frequency or severity of migraines was accurate and supported by the record. (*Id.* at p. 22.)

**1.      Legal Framework for Step Three Evaluation of Headaches**

At Step Three of the disability evaluation process, a claimant will be found disabled if her impairment meets or equals one of the listings in the Listing of Impairments. *See* 20 C.F.R. § 404.1520(a)(4)(iii).  "Each listing specifies 'the objective medical and other findings needed to satisfy the criteria of that listing.'" *Reynolds v. Comm'r of Soc. Sec.*, 424 F. App'x 411, 414 (6th

---

[7] Ms. Weese also argues that the ALJ "erred when he failed to discuss any effects the headaches would have on her ability to engage in substantial gainful activity on a full-time and sustained basis," citing *Harper v. Comm'r of Soc. Sec.*, No. 1:20cv1304, 2021 WL 2383833, *12 (N.D. Ohio May 25, 2021). (ECF Doc. 8, p. 15.)  This argument pertains to the ALJ's subjective symptom analysis and will therefore be addressed in Section VI.B.3., *infra*.

Cir. 2011) (quoting 20 C.F.R. § 404.1525(c)(3)). The claimant bears the burden to prove that her condition meets or equals a listing. *See* 20 C.F.R. §§ 404.1520(d), 416.920(d); *Peterson v. Comm'r of Soc. Sec.*, 552 F. App'x 533, 539 (6th Cir. 2014) (citing *Foster v. Halter*, 279 F.3d 348, 354 (6th Cir. 2001)). To do so, she "must present specific medical findings that satisfy the various tests listed in the description of the applicable impairment or present medical evidence which describes how the impairment has such equivalency." *Thacker v. Soc. Sec. Admin.*, 93 F. App'x 725, 728 (6th Cir. 2004).

"[N]either the listings nor the Sixth Circuit require the ALJ to 'address every listing' or 'to discuss listings that the applicant clearly does not meet.'" *Smith-Johnson v. Comm'r of Soc. Sec.,* 579 F. App'x 426, 432 (6th Cir. 2014) (quoting *Sheeks v. Comm'r of Soc. Sec.*, 544 F. App'x 639, 641 (6th Cir. 2013)). An "ALJ should discuss the relevant listing, however, where the record raises 'a substantial question as to whether [the claimant] could qualify as disabled' under a listing." *Smith-Johnson*, 579 F. App'x at 432 (citing *Abbott v. Sullivan*, 905 F.2d 918, 925 (6th Cir. 1990)) (alteration in original).

While there is no listing for headaches, SSR 19-4p provides guidance on how "primary headache disorders" such as migraines are established and evaluated, SSR 19-4p, 84 Fed. Reg. 44667, 44667-71 (Aug 26, 2019), and explains: "While uncommon, a person with a primary headache disorder may exhibit equivalent signs and limitations to those detailed in listing 11.02 (paragraph B or D for dyscognitive seizures), and we may find that his or her MDI(s) medically equals the listing," *id*. at 44671. While a claimant cannot "meet" a listing for headache—as no such listing exists—her headaches could "medically equal" Listing 11.02 for epilepsy. *Id*. SSR 19-4p further addresses the application of Paragraph B of Listing 11.02 to headaches as follows:

> Paragraph B of listing 11.02 requires dyscognitive seizures occurring at least once a week for at least 3 consecutive months despite adherence to prescribed treatment.

> To evaluate whether a primary headache disorder is equal in severity and duration to the criteria in 11.02B, we consider: A detailed description from an [acceptable medical source] of a typical headache event, including all associated phenomena (for example, premonitory symptoms, aura, duration, intensity, and accompanying symptoms); the frequency of headache events; adherence to prescribed treatment; side effects of treatment (for example, many medications used for treating a primary headache disorder can produce drowsiness, confusion, or inattention); and limitations in functioning that may be associated with the primary headache disorder or effects of its treatment, such as interference with activity during the day (for example, the need for a darkened and quiet room, having to lie down without moving, a sleep disturbance that affects daytime activities, or other related needs and limitations).

(*Id.* (emphasis added).)

To show that an impairment medically equals a listing, Ms. Weese must prove that "the findings related to [the] impairment(s) [were] at least of equal medical significance to those of a listed impairment."  20 C.F.R. § 404.1526(b)(2).  Further, Ms. Weese cannot be found to medically equal a listing unless the evidentiary record also contains one of the following:

1.  A prior administrative medical finding from [a state agency medical consultant] or [psychological consultant] from the initial or reconsideration adjudication levels supporting the medical equivalence finding, or

2.  [Medical expert] evidence, which may include testimony or written responses to interrogatories, obtained at the hearings level supporting the medical equivalence finding, or

3.  A report from the [Appeals Council]'s medical support staff supporting the medical equivalence finding.

SSR 17-2p, 82 Fed. Reg. 15263, 15265 (March 27, 2017).  Thus, an ALJ may only find medical equivalence at the hearing level if the record contains supportive medical opinion findings from either a state agency consultant or a medical expert.  *Id.*  Conversely, if the ALJ "believes the evidence does not reasonably support a finding that the individual's impairment(s) medically equals a listed impairment," SSR 17-2p provides that the ALJ need not obtain medical expert

evidence, and in fact need not even "articulate specific evidence supporting his or her finding that the individual's impairment(s) does not medically equal a listed impairment." *Id.*

### 2. Whether the ALJ Erred by Failing to Discuss SSR 19-4p

Ms. Weese argues that the ALJ erred when he "failed to discuss" SSR 19-4p, but fails to cite authority requiring discussion of SSR 19-4p. (ECF Doc. 8, p. 14.) SSR 19-4p provides guidance on how ALJs and Appeals Council adjudicators should "make findings about medical equivalence in disability claims," and outlines the evidentiary and articulation requirements governing such medical equivalence findings. SSR 17-2p, 82 Fed. Reg. at 15264-65.

Here, the ALJ identified "Migraine" as a severe impairment at Step Two (Tr. 1132), and then found at Step Three that Ms. Weese's impairments did not equal Listing 11.02, explaining:

> <u>No treating or examining physician has indicated findings that would satisfy the severity requirements of any listed impairment</u>. In reaching the conclusion that the claimant does not have an impairment or combination of impairments that meet or medically equal a listed impairment, <u>I also considered the opinions of State Agency medical consultants</u> who evaluated this issue at the initial and reconsideration levels of the administrative review process and reached the same conclusion. All of the listings were considered in reaching this finding, with specific emphasis on listings 1.15, 1.16, 1.17, 1.18, 5.06, <u>11.02</u>, 11.14, 12.04, 12.06, 12.08, and 12.15.

(Tr. 1133 (emphasis added).) The ALJ therefore specifically explained that he considered Listing 11.02 when he found Ms. Weese did not meet or medically equal any listed impairment, that he considered the state agency medical consultant findings reaching the same conclusion, and that he also considered the lack of other medical opinion findings that the severity requirements of the listings were met. (*Id.*) Thus, he accurately pointed out the lack of the medical opinion evidence required by SSR 17-2p to support any medical equivalence finding. *See* SSR 17-2p, 82 Fed. Reg. at 15265. And because he believed the evidence did not support a medical equivalence finding, he was not required to "articulate specific evidence supporting his . . . finding" that Ms. Weese's impairments did not medically equal Listing 11.02. *See id.*

Ms. Weese also has not met her burden to raise "'a substantial question as to whether [she] could qualify as disabled' under a listing." *Smith-Johnson*, 579 F. App'x at 432 (citing *Abbott*, 905 F.2d at 925). To demonstrate a "substantial question," the Sixth Circuit has explained that "[a] claimant must do more than point to evidence on which the ALJ could have based his finding." *Id*. (citing *Sheeks*, 544 F. App'x at 641–42); *see also Sheeks*, 544 F. App'x at 642 (explaining that establishing a "substantial question" requires more than "a mere toehold in the record on an essential element of the listing"). "Rather, the claimant must point to specific evidence that demonstrates [s]he reasonably could meet or equal *every requirement* of the listing." *Id*. (emphasis added). "Absent such evidence," an ALJ "does not commit reversible error by failing to evaluate a listing at Step Three." *Id*. at 433.

Ms. Weese does not point to specific evidence demonstrating that she could equal every requirement of Listing 11.02; instead, the evidence she cites appears to be limited to migraine diagnoses listed in unrelated treatment records and her own subjective reports. (*See* ECF Doc. 8, pp. 14-15.) Her additional argument that the ALJ mischaracterized medical records does not alter this analysis. (*Id.* at p. 14.) At Step Four, the ALJ provided a detailed discussion of the medical records relating to the treatment of Ms. Weese's post-traumatic seizure disorder, epilepsy, migraine, vertigo, and obstructive sleep apnea. (Tr. 1139-40.) In that discussion, he acknowledged Ms. Weese's 1992 head injury, outlined the neurology records detailing her treatment for migraines from 2017 through 2019, highlighted the 2018 and 2020 medical records that reported the improvement and/or resolution of her migraines, and observed that the "medical record lacks recent neurology records to establish the frequency or severity of migraines." (*Id.*) Ms. Weese argues that this statement was "incorrect" because migraines were listed as a diagnosis on recent non-neurological medical records, and because she testified regarding the

45

frequency of her migraines at her disability hearing.  (ECF Doc. 8, p. 14 (citing Tr. 1184 (testimony); Tr. 1994, 2021, 2031 (anesthesia evaluation for foot surgery); Tr. 2449 (supervised weight loss virtual visit); Tr. 2612 (back pain office visit).)  None of that evidence undermines the ALJ's accurate observation that there are no recent neurological treatment records to show that Ms. Weese was reporting—to her treating neurologist—migraines of a frequency and severity that was consistent with the migraines she described to the ALJ.  Thus, the Court finds that Ms. Weese has not met her burden to show that the ALJ's Step Three findings lacked the support of substantial evidence, and further finds that the ALJ "made sufficient factual findings elsewhere in his decision to support his conclusion[s] at step three."  *Forrest v. Comm'r of Soc. Sec.*, 591 F. App'x 359, 366 (6th Cir. 2014).

For the reasons set forth above, the Court finds that the ALJ appropriately addressed medical equivalence as to Listing 11.02, in accordance with the regulatory requirements, and that Ms. Weese has not met her burden to demonstrate that the ALJ's findings at Step Three amounted to reversible error.  The Court finds the second assignment of error lacks merit.

**D.     Third Assignment of Error: Whether ALJ Appropriately Considered Subjective Complaints Pursuant to SSR 16-3p.**

In her third assignment of error, Ms. Weese argues that the ALJ "failed to comply with caselaw setting forth the standard for determining whether pain is a disabling impairment as a 2-step process" because "the RFC incorrectly failed to include the effects of Plaintiff's pain[,] which would further impact her ability to stand and maintain attention and concentration," and because "[t]he medical evidence in this matter supports the combination of her headaches, pain and fatigue precluded Plaintiff from engaging in substantial gainful activity on a full-time and sustained basis."  (ECF Doc. 8, pp. 20-21.)  She further argues that the ALJ failed to consider her obesity under SSR 19-2p.  (*Id.* at p. 21.)  The Commissioner counters that the ALJ complied with

16-3p by discussing the subjective reports and objective evidence, acknowledging Ms. Weese's complaints of pain, headaches, fatigue, obesity, and other impairments, considering the effect that those impairments would have on her work-related capacity, and then concluding that the symptoms did not render her disabled from all work.  (ECF Doc. 11, p. 23 (citing Tr. 1132-48).)

### 1.    Legal Standard for Evaluation of Subjective Symptoms

As a general matter, "an ALJ is not required to accept a claimant's subjective complaints and may properly consider the credibility of a claimant when making a determination of disability." *Jones*, 336 F.3d at 476; *see Alexander v. Kijakazi*, No. 1:20-cv-1549, 2021 WL 4459700, *13 (N.D. Ohio Sept. 29, 2021) ("An ALJ is not required to accept a claimant's subjective complaints.") (citing *Jones*, 336 F.3d at 476); *see also* 20 C.F.R. § 404.1529(a) and SSR 16-3p, *Evaluation of Symptoms in Disability Claims*, 82 Fed. Reg. 49462, 49463 (Oct. 25, 2017) (explaining that a claimant's statements of symptoms alone are not sufficient to establish the existence of a physical or mental impairment or disability).

Under the two-step process used to assess the limiting effects of a claimant's symptoms, a determination is first made as to whether there is an underlying medically determinable physical or mental impairment that could reasonably be expected to produce the claimant's symptoms.  SSR 16-3p, 82 Fed. Reg. 49462, 49463; *Rogers v. Comm'r Soc. Sec.*, 486 F.3d 234, 247 (6th Cir. 2007) (citing 20 C.F.R. § 416.929(a)).  If that requirement is met, the second step is to evaluate of the intensity and persistence of the claimant's symptoms to determine the extent to which they limit the claimant's ability to perform work-related activities.  SSR 16-3p, 82 Fed. Reg. 49462, 49463; *Rogers*, 486 F.3d at 247.  There is no dispute that the first step is met in this case (Tr. 1136), so the discussion will focus on the ALJ's compliance with the second step.

In undertaking this analysis, an ALJ should consider objective medical evidence, a claimant's subjective complaints, information about a claimant's prior work record, and

information from medical and non-medical sources. SSR 16-3p, 82 Fed. Reg. 49462, 49464-49466; 20 C.F.R. 404.1529(c)(3). Factors relevant to a claimant's symptoms include daily activities, types and effectiveness of medications, treatment received to address symptoms, and other factors concerning a claimant's functional limitations and restrictions due to pain or other symptoms. SSR 16-3p, 82 Fed. Reg. at 49465-49466; 20 C.F.R. 404.1529(c)(3).

SSR 96-8p further advises that the RCF analysis should discuss "why reported symptom-related functional limitations and restrictions can or cannot reasonably be accepted as consistent with the medical and other evidence." SSR 96-8p, *Assessing Residual Functional Capacity in Initial Claims*, 61 Fed. Reg. 34474, 34478 (July 2, 1996).

### 2. Whether ALJ Appropriately Addressed Subjective Allegations of Pain, Headaches, Fatigue, and/or Obesity

Ms. Weese argues that the medical evidence supports a finding that the combination of her headaches, pain, fatigue, and/or obesity precluded her from engaging in substantial gainful activity on a full-time and sustained basis. (ECF Doc. 8, pp. 20-21.)

A review of the ALJ decision reveals that he considered Ms. Weese's subjective complaints at length, including her allegations of frequent migraines, knee pain, tingling neuropathy pain, back pain, fatigue, extensive sleep, daytime napping, falling asleep at work, and medication side effects, but found that "the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence of record[.]" (Tr. 1134-36.) Before making these observations, he concluded at Step Three that none of her impairments would meet or medically equal a listed impairment, but made the following additional findings regarding her obesity:

> I also considered the effects of obesity under the Social Security Rulings. In this case, obesity would reasonably be expected to contribute to joint pain. The claimant has also been advised to lose weight in an effort to reduce fatigue[.]

48

(Tr. 1133.)  The ALJ then provided a detailed discussion of the medical records relating to Ms. Weese's treatment for: back impairments and pain (Tr. 1136-37); knee impairments and pain (Tr. 1137-38); foot impairments, surgery, and pain (Tr. 1138); gastroesophageal reflux disease (*id.*); peripheral neuropathy (Tr. 1138-39); seizure disorders, migraines, and sleep apnea (Tr. 1139-40); mental disorders (Tr. 1141-42); and fatigue (Tr. 1142-45).  As noted in section VI.B., *supra*, the ALJ provided two lengthy paragraphs of discussion to explain his finding that fatigue would not preclude Ms. Weese from engaging in a normal workday or workweek.  (*See* Tr. 1144-45.) He proceeded to discuss the medical opinion evidence (Tr. 1145-47), including specific findings that: Ms. Weese's "mental symptoms, pain and fatigue" merited the inclusion of additional mental RFC limitations (Tr. 1145); the combination of obesity, knee pain, neuropathy, and migraines merited a reduction to light exertional work (Tr. 1146); "migraine triggers such as light and noise considerations" merited additional physical RFC limitations (Tr. 1147); and complaints of fatigue in the consultative examination did not lead the consultative examiner to recommend extra breaks, absences, or naps (*id.*).

In summary, the ALJ acknowledged Ms. Weese's allegations of pain, headaches, and migraines, as well as the potential impact of her obesity on her other impairments, but concluded that the medical evidence and the evidence relating to her activities supported the physical and mental limitations in the RFC but did not preclude full time work.  A review of the ALJ decision thus reveals that the ALJ considered the entire record, based his findings on relevant factors, and provided "specific reasons for the weight given to the individual's symptoms."  SSR 16-3p, 82 Fed. Reg. 49462, 49467.

In challenging the ALJ's findings, Ms. Weese summarizes certain evidentiary records that detail her subjective complaints and medical treatment, but does not identify what, if any,

records the ALJ allegedly ignored or mischaracterized.  (*See* ECF Doc. 8, pp. 16-20.)  She then argues based on her evidentiary summary that the medical evidence supports a finding that the combination of her headaches, pain, and fatigue precluded her from engaging in substantial gainful activity on a full time and sustained basis.[8]  (*Id.* at p. 22.)  But even if Ms. Weese could show by a preponderance of the evidence that her subjective complaints were supported by or consistent with the medical records, this Court cannot overturn the ALJ's finding to the contrary "so long as substantial evidence also support[ed] the conclusion reached by the ALJ."  *Jones*, 336 F.3d at 477; *Blakley*, 581 F.3d at 406.  Regardless of whether the evidence could support greater RFC limitations consistent with Ms. Weese's subjective complaints, the question before this Court is whether there was substantial evidence to support the ALJ's finding to the contrary.

For the reasons set forth above, the Court finds that Ms. Weese has not met her burden to demonstrate that the ALJ's analysis of her subjective complaints lacked the support of substantial evidence, and further finds that the ALJ complied with the regulatory standards articulated in SSR 16-3p.  The third assignment of error lacks merit.

## VII.    Conclusion

For the foregoing reasons, the Court **AFFIRMS** the Commissioner's decision.

September 17, 2024

/s/*Amanda M. Knapp*
AMANDA M. KNAPP
United States Magistrate Judge

---

[8] Ms. Weese's additional conclusory and perfunctory arguments that the ALJ "cherry pick[ed]" the evidence, failed to articulate a supportable rationale for his subjective symptom analysis, made a decision that was "contradictory," and failed to build a logical bridge between the evidence and the result (ECF Doc. 8, pp. 22-24) are deemed waived. *See Hollon*, 447 F.3d at 491; *McPherson*, 125 F.3d at 995–96.